IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:11 CV 1029 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | WILLIAM H. BAUGHMAN, JR. |
| RICHARD M. OSBORNE, SR., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | **REPORT & RECOMMENDATION** |

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-
    A.    Overview – complaints . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-
    B.    Overview – Developers' motions to dismiss . . . . . . . . . . . . . . . . . . . . . -4-

Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-
    A.    Standard of review/motion to dismiss . . . . . . . . . . . . . . . . . . . . . . . . . -5-
    B.    Application of standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-
        1.    The motion to dismiss the federal complaint should be denied. . . -8-
            a.    Standard for establishing CWA jurisdiction . . . . . . . . . . . -8-
            b.    Motion and response . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
            c.    The motion to dismiss the federal claims should be denied.
               . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-
               (i)    Nature and history of the jurisdictional test; *Rapanos*
                    formulations . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-
               (ii)    Application of *Polyurethane Foam* to the complaint's
                    jurisdictional pleadings of both *Rapanos* tests . . . -19-
            d.    Developers' motion to dismiss the state law claims should be
               denied. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -24-

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-

Objections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-

## Introduction

This is a civil action alleging violations of federal and state clean water statutes on land in Lake County, Ohio.[1]  Before me by referral[2] are:

(1)    motions to dismiss filed by defendants

       (a)    Richard Osborne, Sr., individually and as trustee of the Richard Osborne Trust (Osborne);

       (b)    Midway Industrial Campus, Ltd.; Madison/Route 20 LLC; and JTO, Inc. (collectively, Developers);[3] as well as,

(2)    a motion for summary judgment filed by defendant the Naylor Family Partnership (NFP).[4]

---

[1] ECF # 1.

[2] ECF # 76.

[3] ECF # 35 (Developers' motion to dismiss federal complaint); ECF # 36 (Developers' motion to dismiss state crossclaims); ECF # 38 (Osborne's motion to dismiss federal and state claims).

[4] ECF # 31.

The United States (Government) and the State of Ohio (State)[5] have responded in opposition to those motions,[6] and replies to that opposition have been filed.[7]

 Because discussions of these motions are so lengthy, I will address them in separate reports, with this report considering Developers' motions to dismiss and subsequent reports addressing Osborne's motion to dismiss and NFP's motion for summary judgment.

## Facts

### A.     Overview – complaints

This case is rooted in the federal claim[8] that from 2001 to 2004 "one or more" defendants "discharged dredged or fill material" from a commercial real estate development in Lake County,[9] Ohio, into "waters of the United States" without a prior permit from the

---

[5] The State was initially a defendant that filed a cross-claim, but has since been realigned as a plaintiff by a non-document order of November 28, 2011.

[6] ECF # 61 (opposition by State of Ohio to NFP motion); # 64 (opposition by United States to NFP motion); # 60 (opposition by State of Ohio to Developers' motion to dismiss state claims); # 62 (opposition by United States to Developers' motion to dismiss federal claims); # 59 (opposition by State of Ohio to Osborne motion to dismiss); # 63 (opposition by United States to Osborne motion to dismiss).

[7] ECF # 65 (NFP's reply to United States); # 66 (NFP's reply to the State of Ohio); # 70 (Developers' reply to United States); # 71 (Developers' reply to State of Ohio); # 72 (Osborne's reply to the United States and the State of Ohio).

[8] The State acknowledges that its state law claims arise out of the same set of operative facts as alleged in the federal claim.  *See*, ECF # 60 at 9-10.

[9] ECF # 1 at ¶¶ 39, 42.

Army Corps of Engineers, thus violating the federal Clean Water Act (CWA)[10] and related state statutes.[11]  The defendants are alleged to have ownership interests in the site and/or to be the entities responsible for the violation.[12]  The complaint seeks payment of civil penalties, injunctive relief to prevent further discharges, and restoration of the wetlands on the development site.[13]

**B.    Overview – Developers' motions to dismiss**

Developers' motions to dismiss essentially raise the issue that the complaints have not adequately pled facts sufficient to find that the Government or the State possess jurisdiction as defined by law.[14]  In response, both the United States and the State of Ohio maintain that the allegations of the complaints sufficiently to demonstrate, or permit the reasonable inference, that the site contains a protected wetland and tributaries under the regulatory jurisdiction of the CWA[15] and the Ohio Revised Code.[16]  Alternatively, the Government and

---

[10] *Id.* at ¶ 1.

[11] *See*, ECF # 2 at ¶ 50.

[12] ECF # 1 at ¶¶ 6-11.

[13] *Id*. at ¶ 2.

[14] ECF # 35 (Government claims); # 36 (State claims).

[15] ECF # 62 at 7-13.

[16] ECF # 60 at 3-8.

the State assert that if any deficiency in the pleadings exists, permission to amend should be granted.[17]

## Analysis

### A.    Standard of review/motion to dismiss

Federal Civil Rule 8 requires only that a pleading contain "a short and plain statement of the claim showing the pleader is entitled to relief."[18] Federal Civil Rule 12(b)(6) provides that a court may grant a motion to dismiss a complaint only when, after construing the allegations in a light most favorable to the plaintiff and accepting all well pleaded allegations as true, the court determines that the plaintiff can prove no set of facts in support of those allegations that would entitle him to relief.[19]

In *Ashcroft v. Iqbal*,[20] and *Bell Atlantic v. Twombly*,[21] the Supreme Court has held that to survive a 12(b)(6) motion to dismiss a complaint, it must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"[22] As Judge Zouhary recently noted in *In re Polyurethane Foam Antitrust Litigation*, under this "plausibility

---

[17] ECF # 62 at 13-14; ECF # 60 at 5.

[18] Fed. R. Civ. P. 8(a)(2).

[19] *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005).

[20] *Ashcroft v. Iqbal*, 556 U.S.662, 129 S. Ct. 1937 (2009).

[21] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007).

[22] *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).

pleading standard," a complaint must contain "allegations plausibly suggesting (not merely consistent with)" the defendant's liability.[23] But "this standard neither imposes a probability requirement nor requires ultra specific factual allegations."[24] Rather, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level," or "raise a reasonable expectation that discovery will reveal evidence" of the defendant's liability.[25]

Courts employ a two-step process when evaluating the facial plausibility of a complaint.[26]

First, a "court must dispose of those allegations not entitled to the presumption of truth."[27] This means, as the Supreme Court stated in *Iqbal*, "[t]hreadbare recitals of the elements of a cause of action [that are] supported by mere conclusory statements."[28]  Care must be taken, however, not to dismiss conclusory allegations when a court determines from

---

[23] *In re Polyurethane Foam Antitrust Litigation*, __ F. Supp. 2d __, 2011 WL 3204712, at *11 (N.D. Ohio Sept. 15, 2011) (quoting *Twombly*, 550 U.S. at 557).

[24] *Id*. (citations omitted).

[25] *Id*. (quoting *Twombly*, 550 U.S. at 555, 556).

[26] *Id*.

[27] *Id*.

[28] *Iqbal*, 129 S. Ct. at 1949.

a fair reading of the complaint as a whole that those conclusory allegations are supported by factual allegations.[29]

Second, a court must then determine whether the remaining allegations, if taken as true, "plausibly give rise to an entitlement to relief."[30] A plausible claim is not merely "possible" or "conceivable,"[31] but rather is an allegation which permits a court to draw from it the "reasonable inference that the defendant is liable for the misconduct alleged."[32]

In applying the plausibility pleading standard, the court must take care not to do so simplistically, rigidly, or mechanically.  As Judge Zouhary further observed in *Polyurethane Foam*, the plausibility pleading standard should not be glossed so as to "doom[] *any* complaint paragraph containing a term that, by itself, constitutes a legal conclusion, regardless of any factual support that may exist for that allegation anywhere in the complaint. ... [E]ven in its most expansive reading, *Twombly* does not support such an exacting dissection of a complaint."[33]

Further care must be taken not to dismiss as a "legal conclusion" an allegation that is actually factual in nature merely because a defendant asserts that such an allegation "does

---

[29] *Twombly*, 550 U.S. at 564.

[30] *Iqbal*, 129 S. Ct. at 1950.

[31] *Twombly*, 550 U.S. at 557.

[32] *Iqbal*, 129 S. Ct. at 1949.

[33] *Polyurethane Foam*, 2011 WL 3204712, at *13.

not contain *enough* factual specificity."[34]  Factual allegations "are readily distinguishable from solely legal conclusions."[35]  Specifically, a factual allegation's "veracity can be demonstrated on its own terms," whereas, a legal conclusion would require an analysis of underlying facts to determine whether "the asserted legal determination is appropriate."[36]

Moreover, courts must be alert to arguments from a defendant that *Twombly* requires a plaintiff to advance specific factual allegations describing the particularized "who, what, when, where and how" of the defendant's liability.[37]  As the *Polyurethane Foam* opinion succinctly observed in rejecting that approach," *Twombly* stands for no such proposition."[38]  Indeed, "the plausibility pleading standard does not require a court to construct a mandatory checklist" of detail required in every complaint.[39]

**B.  Application of standards**

*1.  The motion to dismiss the federal complaint should be denied.*

*a.  Standard for establishing CWA jurisdiction*

The Sixth Circuit held in *United States v. Cundiff* that to establish liability under the CWA, the United States must show that:  "(1) a person (2) discharged a pollutant (3) from

---

[34] *Id*. (emphasis original).

[35] *Id.*

[36] *Id*.

[37] *Id.* at 14.

[38] *Id*.

[39] *Id*.

a point source (4) into waters of the United States (5) without a permit."[40]  There is no requirement that the discharge be shown to have had a "deleterious effect on downstream waters."[41]

Notwithstanding these seemingly straightforward elements, the Middle District of Tennessee recently observed, in *United States v. Roberts*, that "what the Government must actually prove to establish [CWA] liability is open to considerable debate."[42]

Specifically, because of "what has been oft-characterized as a 'fractured' opinion"[43] by the United States Supreme Court in *Rapanos v. United States*,[44] which addressed when the Army Corps of Engineers could exercise jurisdiction over wetlands under the CWA, district courts seeking to "determine whether particular wetlands are subject to the CWA"[45] must deal with "the real difficulty ... [of] determining which – if any – of the three main opinions [in *Rapanos*] lower courts should look to for guidance."[46]

As the Fourth Circuit recently noted, "[t]he *Rapanos* plurality suggested that wetlands should only fall within CWA jurisdiction when they:  (1) are adjacent to a 'relatively

---

[40] *United States v. Cundiff*, 555 F.3d 200, 213 (6th Cir. 2009).

[41] *United States v. Hubenka*, 438 F.3d 1026, 1035 (10th Cir. 2006).

[42] *United States v. Roberts*, 2011 WL 5826614, at *3 (M.D. Tenn. Nov. 17, 2011).

[43] *Id.* (citations omitted).

[44] *Rapanos v. United States*, 547 U.S. 715 (2006).

[45] *Roberts*, 2011 WL 5826614, at *3.

[46] *Cundiff*, 555 F.3d at 207.

permanent body of water connected to traditional interstate navigable waters;' and (2) have 'a continuous surface connection to that water.'"[47]  By contrast, the Fourth Circuit observed that Justice Kennedy, in a concurring opinion, found the plurality test "too limiting"[48] and proposed an alternative test whereby CWA jurisdiction over wetlands would be established when a "significant nexus" exists "between the wetlands in question and navigable waters in the traditional sense."[49]  Finally, the dissent, which drew four votes, "found both of these tests too stringent" and "suggested that in the future, jurisdiction should be established if either the plurality's or Justice Kennedy's test is met."[50]

As the *Roberts* court stated, "[i]f *Rapanos* represents a fractured viewpoint on CWA jurisdiction, the Courts of Appeals' attempts to apply *Rapanos* have only complicated the fracture."[51]  The Seventh and Eleventh Circuits have adopted Justice Kennedy's concurring opinion as the controlling test for CWA jurisdiction, while the First, Third, and Eighth Circuits have held that both the plurality opinion and the concurring opinion are to be used in determining what constitutes "waters of the United States" for purposes of determining

---

[47] *Precon Dev. Corp. v. Army Corps of Eng'rs*, 633 F.3d 278, 288 (4th Cir. 2011) (quoting *Rapanos,* 547 U.S. at 742).

[48] *Id.*

[49] *Id. (*quoting *Rapanos*, 547 U.S. at 779).

[50] *Id*. (citing *Rapanos*, 547 U.S. at 810).

[51] *Roberts*, 2011 WL 5826614, at *4.

-10-

CWA jurisdiction.[52]  Other circuits, including the Sixth Circuit, have "'expressly reserved the issue of which *Rapanos* test or tests governs CWA enforcement actions."[53] In *Cundiff*, the one case decided by the Sixth Circuit, that court found that because "jurisdiction was proper here under each of the primary *Rapanos* opinions, we do not have to decide here, once for all, which test controls in all future cases."[54]

b.    *Motion and response*

The motion to dismiss filed by Developers asserts first that "this Court need not determine, at this time, which test under *Rapanos* is ultimately controlling" in this case.[55] Rather, the motion contends that because the complaint "merely restates statutes, regulations, and the tests from *Rapanos* cloaked as factual allegations, the Court should find "that the United States failed to assert factual allegations substantial enough to raise a right to relief above the speculative level under either *Rapanos* test ...."[56]

In particular, Developers' motion maintains that when the complaint alleges that the "'impacted wetland at the Riverside Commons Site has or had a continuous surface connection, prior to the subject unauthorized activities, to one or more of the tributaries on

---

[52] *Id.* (citations omitted).

[53] *Id.* (quoting *United States v. Donovan*, 661 F.3d 174, 182 n.7 (3rd Cir. Oct. 31, 2011) (collecting cases from Fourth, Fifth, Sixth, and Ninth Circuits)).

[54] *Cundiff*, 555 F.3d at 208.

[55] ECF # 35 at 7.

[56] *Id.*

or at the Site that flow to the Chagrin River,'" such an allegation is just "a naked recitation of the second part of the *Rapanos* plurality test."[57]  As such, Developers argue, the complaint does not "assert a single fact supporting the permanency of the alleged tributaries on the Riverside Commons Site," nor does it state anything "about the continuous surface connection, such as any fact relating to its continuity or location of the connection."[58]  Moreover, Developers assert that the complaint's paragraph 37[59] is simply a "conclusory statement" that constitutes a "rote recitation" of the "significant nexus" test in Justice Kennedy's concurring opinion in *Rapanos*.[60]  Accordingly, because the complaint purportedly fails to allege facts that would support what Developers term the "legal conclusions" and "formulaic recitation of the elements of a cause of action"contained in the complaint, the Developers argue that it should be dismissed.[61]

In response, the United States contends that it has "pled all of the statutory and legal requirements for CWA jurisdiction under both the plurality standard and Justice Kennedy's standard in *Rapanos*," while also setting forth factual allegations "that give Defendants and

---

[57] *Id*. at 8 (quoting complaint at ¶ 36).

[58] *Id.*

[59] Paragraph 37 alleges that the wetlands here are "part of a larger watershed of contiguous, similarly situated waters, and exhibit[] flow characteristics and functions that, when considered alone or in combination with similarly situated features in the region, significantly affect the chemical, physical and biological integrity of the Chagrin River and/or Lake Erie."

[60] *Id*. (citing *Rapanos*, 547 U.S. at 780).

[61] *Id*. at 9 (citing *Twombly*, 550 U.S. at 555).

the Court more than fair notice [of] how it intends to prove, factually, that the legal standards are met."[62]

The Government further contends that neither the Federal Rules of Civil Procedure nor a Supreme Court holding require the complaint to set forth evidence to establish CWA jurisdiction on a motion for summary judgment or at trial.[63]  That evidence, the Government asserts, "is a fair subject of discovery."[64]  After that evidence, including possible expert reports, has been developed, presented to the Court, and tested (such as through cross-examination), "the trier and decisionmaker can [then] determine whether the evidence meets the legal standards in the statute and regulations."[65]  To demand such evidence now, the Government argues, "is premature and turns the Federal Rule of Civil Procedure on their head."[66]

Moreover, the Government maintains, it has pled sufficient facts from which one can "plausibly infer that the tributaries and the wetland at the Site are 'waters of the United States,' [thus] satisfying the United States burden under *Twombly/Iqbal*" and "satisfying either of the *Rapanos* standards ...." [67]  Stated differently, the Government contends that it

---

[62] ECF # 62 at 8.

[63] *Id.*

[64] *Id*.

[65] *Id*. at 9.

[66] *Id.*

[67] *Id*.

has adequately pled both the legal conclusion that waters of the United States are present on

the site, as well as the facts and evidence that are needed to reach that conclusion.[68]

In that regard, the Government points to the following factual allegations of the

complaint:

- That the location of the 280-acre site is less than 0.05 miles east of the Chagrin River and approximately 3.2 miles upstream from Lake Erie, "both of which are traditional navigable waters;"[69]

- That 12,800 linear feet of waterways and a 170-acre wetland existed on the site prior to the unauthorized activities that are the subject of this action.[70]

- That the tributaries at the site are relatively permanent and that they flow either directly or indirectly through other tributaries into the Chagrin River.[71]

- That the wetland on the site had or has a continuous surface connection to one or more of the relatively permanent tributaries at the site.[72]

- That the wetland on the site is part of a larger watershed of similarly situated waters that significantly affect the chemical, physical and biological integrity of the Chagrin River and/or Lake Erie.[73]

- That the 170-acre wetland on the site plays an important role in a variety of key ecosystem functions in the Chagrin River watershed and

---

[68] *Id*.

[69] *Id*. at 10 (citing complaint at ¶¶ 29-31).

[70] *Id*. (citing complaint at ¶¶ 32-33).

[71] *Id*. (citing complaint at ¶ 34).

[72] *Id*. at 11 (citing complaint at ¶ 36).

[73] *Id.* at 12 (citing complaint at  ¶ 37).

> Lake Erie, such as: flood control, pollutant trapping and filtering, nutrient transport, and maintenance of the water quality that contributes to aquatic and wildlife habitat.[74]

The United States argues that these are factual allegations, not legal conclusions; thus, they must be accepted as true in adjudicating a motion to dismiss.[75]  The Government notes, for example, that whether a surface connection actually exists between two bodies of water is a factual issue, not a legal conclusion, although the Supreme Court plurality opinion in *Rapanos* held that proof of such a fact is necessary to establish the legal conclusion that a site contains "waters of the United States."[76]

Accordingly, accepting these factual allegations as true for purposes of this motion, and making all reasonable inferences in favor of the Government, the United States contends that it is plausible to conclude from the complaint that a continuous surface connection exists between the wetland and at least one tributary of the Chagrin River.[77]  Such a plausible allegation, the Government maintains, states a claim for relief under the *Rapano*s plurality test.[78]

In addition, after accepting the allegations as true and making all reasonable inferences in favor of the United States, the Government also asserts that it is plausible to

---

[74] *Id*. (citing complaint at ¶ 38).

[75] *Id.* at 11, 12.

[76] *Id.* at 11.

[77] *Id*. at 11-12.

[78] *Id*. at 12.

conclude that the wetland on the site possesses a "significant nexus" to the navigable waters of the Chagrin River and/or Lake Erie, as would satisfy Justice Kennedy's standard in *Rapanos*.[79] While the Government opines that the ultimate conclusion that a "significant nexus" exists would be a legal conclusion, it contends that the allegations of its pleading are facts that, if found, serve to support the Court drawing the legal conclusion that CWA jurisdiction exists under the concurring opinion of *Rapanos*.[80]

In sum, the United States argues that the allegations of the complaint assert facts regarding the wetland and waterways at issue that, accepted now as true, would support this Court making a reasonable inference that the tributaries and wetland on the site fall within the jurisdiction of the CWA under either test propounded in *Rapanos*.[81]

*c.    The motion to dismiss the federal claims should be denied.*

The essential argument here concerns the nature and sufficiency of the pleadings as to jurisdiction.  The Government asserts, as noted above, that its allegations are factual, and, if proven, are sufficient to make jurisdiction plausible under either *Rapanos* test, thus defeating a motion to dismiss.  Developers, on the other side, maintain that the pleadings are merely legal conclusions that are insufficient to state a basis for jurisdiction since such a claim would require pleading additional facts.[82]  Both sides have at least in part incorrectly

---

[79] *Id*.

[80] *Id.*

[81] *Id*. at 13.

[82] *See,* ECF # 70 at 5.

-16-

characterized the pleadings here, but that the Government's pleadings are sufficient to assert federal jurisdiction and state a claim for relief under both *Rapanos* opinions.

(i)     Nature and history of the jurisdictional test; *Rapanos* formulations

The ultimate legal conclusion here on which jurisdiction would be based is whether the wetland and waters on the site constitute "waters of the United States."[83]  Historically, and prior to the CWA, the issue of whether "waters of the United States" were present, and so whether federal jurisdiction existed, involved an inquiry into whether the waters at issue were navigable.[84]  As such, "[s]ince the decision made [by the Supreme Court] in *The Daniel Ball*[85] [in 1871], the question [of a water's navigability] has been one of fact."[86]  Thus, once navigability had been found as a matter of fact, he court could then use the fact of

---

[83] *See*, *Rapanos*, 547 U.S. at 729; *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 406 n.21 (1940) (superseded by statute) (citation omitted); *see also*, *Allen Gun Club v. United States*, 180 Ct. Cl. 423, 1967 WL 8872, at *3 (U.S. Ct. of Claims June 9, 1967) (citations omitted).

[84] *Appalachian Elec. Power Co.*, 311 U.S. at 404-05.  Navigable waters are "waters of the United States," and so subject to federal jurisdiction, because navigable waters are "capable of use as interstate highways."  *Id*. at 404.  Since *Gibbons v. Ogden*, 22 U.S. 1 (1824), the Supreme Court has held that Congress' power over navigable waters arising under the Commerce Clause is "absolute."  *Appalachian Elec. Power Co.*, 311 U.S. at 405 (citations omitted).

[85] *The Daniel Ball*, 77 U.S. 557 (1870) (superseded by statute).

[86] *United States v. Kentland-Elkhorn Coal Corp.*, 353 F. Supp. 451, 455 (E.D. Ky. 1973).

-17-

navigability as the foundation for drawing the legal conclusion that such waters were part of the "waters of the United States," over which the United States may assert jurisdiction.[87]

*Rapanos* involved the issue of whether non-navigable wetlands could be "waters of the United States."[88]  Because courts could not use the traditional fact inquiry into navigability in the case of wetlands, *Rapanos* determined that courts should address two, alternative predicate questions – analogous to the determination of navigability – so as to provide a factual foundation for drawing the legal conclusion that the wetlands involve "waters of the United States," and thus that there is federal jurisdiction.[89]  As noted earlier, one question, set out in the plurality opinion, has two components and asks whether the wetlands: (1) are "adjacent" to a relatively permanent body of water connected to traditional interstate navigable waters, and (2) have "continuous surface connection" to that water.[90] Alternatively, the concurring opinion also frames a two-part inquiry: whether a

---

[87] *Allen Gun Club*, 1967 WL 8872, at *3.

[88] *Rapanos*, 547 U.S. at 729 (case considers "whether four Michigan wetlands, which lie near ditches or man-made drains that eventually empty into traditional navigable waters, constitute 'waters of the United States' within the meaning of the [CWA]"); *Roberts*, 2011 WL 5826614, at *3 (all *Rapanos* opinions agreed that "the statutory phrase 'waters of the United States' encompasses some waters not navigable in the traditional sense," but then differed as to how courts should determine whether particular wetlands could be found "waters of the United States" for purposes of CWA jurisdiction).

[89] *Id.*

[90] *Rapanos*, 547 U.S. at 742.

(1) "significant" (2) "nexus" exists between the wetlands in question and navigable waters in the traditional sense.[91]

(ii)     Application of *Polyurethane Foam* to the complaint's jurisdictional pleadings of both *Rapanos* tests

Case authority directly construing the pleading of both *Rapanos* tests,[92] as well as the previously-cited authority discussing the proper application of *Twombly* and *Iqbal*, provide direction for addressing the issue of whether the present language of the complaint adequately pleads a justiciable claim for relief under the CWA.

Specifically, the Government here, as stated, has pled the following facts relevant to the two parts of the first, or plurality, *Rapanos* test:

1.    The (a) wetlands are 0.05 miles[93] from (b) the historically navigable Chagrin River.  As such, I recommend finding that these facts, when assumed true, are sufficient for this Court to draw the inference that the wetlands are plausibly "adjacent" to a navigable body of water. Moreover, I recommend finding, as the court recognized in *Vierstra*, that the allegation that a wetlands is "adjacent" to navigable water is a factual allegation.[94]  The factual nature of the allegation of adjacency would therefore be contrary to the Developers' contention that this

---

[91] *Id*. at 779, 782.

[92] *See*, *United States v. Vierstra*, __ F. Supp. 2d __, 2011 WL 1064526 (D. Idaho March 18, 2011); *Benjamin v. Douglas Ridge Rifle Club*, 673 F. Supp. 2d 1210 (D. Oregon 2009).

[93] 0.05 miles is approximately 264 feet or 88 yards.

[94] *Vierstra*, 2011 WL 1064526, at *6.

allegation is one of "mere proximity to tradition navigable waters,"[95] that "conjures regulatory jurisdiction through legal conclusions."[96]

2.      There is a continuous surface connection between the waters of the wetland on the site and the Chagrin River by reason of one or more relatively permanent tributaries flowing across the wetland into the Chagrin River.  *Vierstra* also found that allegations of a "continuous surface connection" and of a "relatively permanent" body of water, are factual allegations, not legal conclusions.[97]  *Vierstra* further found that such an allegation of a continuous surface connection, if proved, supports a finding that the connected water "constitutes 'waters of the United States' subject to the federal Clean Water Act (CWA)" under the *Rapanos* plurality test.[98]

Additionally, as pled, and as evaluated under *Polyurethane Foam*, these are factual allegations, not a legal conclusion, because the veracity of these claims can be determined without consideration of other facts to test if a conclusion is justified.  Further, again under the reasoning of *Polyurethane Foam*, Developers' insistence on additional pleaded facts to establish how permanent the tributaries are or the exact location of the surface connection,[99] is not required by *Twombly* or *Iqbal*.[100]  Accordingly, under the *Rapanos* plurality test, the Government's pleading of jurisdictional facts withstands the motion to dismiss.

---

[95] ECF # 70 at 4.

[96] *Id*. at 5.

[97] *Vierstra,* 2011 WL 1064526, at *3-4.

[98] *Id*.

[99] *See*, ECF # 35 at 8.

[100] *Polyurethane Foam*, 2011 WL 3204712, at *13.

Similarly, under the jurisdictional test propounded in the *Rapanos* concurring opinion, the Government has pled the following:

1.  A "nexus" between the wetlands and navigable water exists by reason of the continuous surface connection between them that has already been pled.  In this respect, I note, as did the court in *Douglas Ridge Rifle Club*, that "a wetland with a hydrological connection to the navigable-in-fact water would satisfy the physical connection ["nexus"] aspect of Justice Kennedy's 'significant nexus' test."[101]  Accordingly, I recommend finding that the Government's pleading here is sufficient to plead the "nexus" element of this test.

2.  The "nexus" is "significant" as regards the navigable waters because the impacted wetland on the site "provides or provided flood control and/or flood storage; provides or provided pollutant trapping and/or filtering functions; provide or provided nutrient transport; and/or maintains or maintained the chemical composition of the water, natural discharge patterns, and water quality functions that contributed to the aquatic and wildlife habitat of the Chagrin River and Lake Erie."[102]

The "significance" of the "nexus" under the test set forth in the *Rapanos* concurring opinion is, like the plurality test,  a fact issue for the jury, not the ultimate legal conclusion that the waters are "waters of the United States."[103]  But the determination of "significance" is a conclusory fact, which requires predicate facts for its proof.

---

[101] *Douglas Ridge Rifle Club*, 673 F. Supp. 2d at1218 (citation omitted); *see also*, *Vierstra*, 2011 WL 1064526, at * 6 (allegation of "the mere connection between the various waterways" is sufficient to plead the existence of a "nexus" between them).

[102] ECF # 1 at ¶ 38.

[103] *See*, *Rapanos*, 547 U.S. at 782 (significant nexus must be established on a "case-by-case basis"); *Roberts*, 2011 WL 5826614, at *4 (jury question as to whether waters in that case are jurisdictionally "waters of the United States" under both the plurality and concurring opinions in *Rapanos*); *see also*, *Douglas Ridge Rifle Club*, 673 F. Supp. 2d at 1219.

-21-

Specifically, this test for "significance" arose because Justice Kennedy was clear in the concurring opinion in *Rapanos* that if a wetlands' effect on water quality in navigable waters was merely speculative or insubstantial, any nexus would fall outside the zone fairly encompassed by the term "navigable waters."  Thus, the Ninth Circuit in *City of Healdsburg*[104] observed that some direct facts must exist as to the hydrological, ecological and/or[105] chemical connection between the wetland and the navigable water in order to be able to then draw the concluding inference that any "nexus" between them is "significant."[106]

Here, as stated above, the complaint initially alleges the factual conclusion that the connections between the wetlands and waters at the site and the Chagrin River are hydrologically, chemically and ecologically significant.[107]  In addition, the complaint makes

---

[104] *Northern California River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

[105] Some dispute exists as to whether establishing a "significant nexus" requires showing that a wetland has chemical, biological *and* physical connection with a navigable-in-fact waterway, or whether a "significant nexus" can be established by only a demonstration of a significant chemical, physical *or* biological connection between the wetland and navigable water.  *Douglas Ridge Rifle Club*, 673 F. Supp. 2d at 1217 n.4.  In either case, for purposes of the sufficiency of the pleading, facts must be alleged from which the inference can be drawn that the connection was "significant."

[106] *See*, *Douglas Ridge Rifle Club*, 673 F. Supp. 2d at 1217 n.4.  "What is important is not that the nexus between the wetland and the navigable water is chemical, physical, and biological, but that the nexus is *significant*.  Therefore, a showing of a *significant* chemical, physical, or biological connection satisfies Justice Kennedy's test."  (Emphasis original).

[107] ECF # 1 at ¶¶ 37, 38.

-22-

specific, direct, underlying factual allegations (*i.e*, flood control, nutrient transport, chemical composition, etc.) from which this Court may infer that the connections are "significant."[108]

Moreover, unlike the non-navigable tributary in *United States v. Vierstra* that flowed only six to eight months a year,[109] thus requiring additional evidence of flow rates and volume to establish significance, the Government alleges here that the tributaries on the site are "relatively permanent" and flow "directly or indirectly" into navigable water.[110] Accordingly, I recommend finding that the complaint here sufficiently alleges facts that would plausibly permit the inference that the hydrological nexus is significant, regardless of whether significance must be shown as to multiple elements or can be established with only one element.[111]

As with the *Rapanos* plurality opinion, Developers' motion to dismiss under the *Rapanos* concurring opinion incorrectly asserts that *Twombly/Iqbal* requires the Government

---

[108] The reason why a "nexus" must also be "significant" is found in Justice Kennedy's opinion itself, which took as its starting point a concern that under the majority's simple focus on a mere surface connection, "[t]he merest trickle, if continuous, would count as a 'water' subject to federal jurisdiction." *Rapanos*, 547 U.S. at 784.

[109] *Vierstra*, 2011 WL 1064526.

[110] ECF # 1 at ¶ 34.

[111] *See*, *Douglas Ridge Rifle Club*, 673 F. Supp. 2d at 1218. "A wetland with a hydrological connection to the navigable-in-fact water would satisfy the physical connection aspect of Justice Kennedy's 'significant nexus' test."

to plead "when, where and how" details[112] that *Polyurethane Foam* teaches are plainly not mandated under a plausibility pleading.

The complaint here sufficiently states a claim for relief under either or both *Rapanos* tests, the more restrictive approach of the plurality opinion on Justice Kennedy's concurring opinion and the less restrictive concurring opinion. I, therefore, recommend that Developers' motion to dismiss the federal complaint under Rule 12(b)(6) be denied.

d.     *Developers' motion to dismiss the state law claims should be denied.*

As with the hallenge to the federal complaint, this motion from Developers attacks the complaint of the State on the grounds that it does not allege sufficient facts from which the Court may conclude that the site contains "waters of the State," as required for the assertion of state jurisdiction.[113]  In addition, the Developers then contend that the State's complaint fails to allege facts regarding how the defendants' alleged actions on the site had "significant adverse impacts" on the wetlands, such as required to establish liability.[114]  Finally, Developers assert that although the State alleges that the site is subject to federal jurisdiction, the State's complaint does not make any factual allegations that would support finding such jurisdiction under the *Rapanos* tests.[115]

---

[112] *See*, ECF # 35 at 8-9.

[113] *See*, ECF # 36 at 1.

[114] *Id.* at 6.

[115] *Id.* at 6-7.

In response, the State contends in its complaint that:  (1) a wetland exists on the site;[116] (2) a "perennial" stream crosses the site, and is adjacent to and has a continuos surface connection to the wetlands;[117] (3) and the stream is a tributary of the Chagrin River, thus making the wetland and drainage ways "waters of the United States" under federal law and "waters of the state" pursuant to the Ohio Revised Code.[118]  The State also contends that, according to estimates from the U.S. Army Corps of Engineers, more than 69.5 acres of wetlands and more than 3,800 linear feet of stream on the site have been dredged or filled by the defendants.[119]  The State further alleges that as a consequence of the defendants' actions of grubbing, clearing trees, and other vegetation, filling, excavating and/or grading on that 69.5 acre portion of the site, such actions caused significant adverse impacts on the wetland and waters of the State.[120]  Moreover, the State argues that these actions were done without a permit from the Ohio EPA, making them in violation of Ohio law.[121]  Finally, the State maintains that although its claims arise from the same set of operative facts as do the federal

---

[116] ECF # 2 at ¶ 37.

[117] *Id.*

[118] *Id.*

[119] *Id.* at ¶ 39.

[120] *Id.* at ¶¶ 39, 40, 41, 43 and 44.

[121] *Id.* at ¶ 50.

claims and are so related, the claims are independent of the federal claims, such that there is no need to assert federal jurisdiction.[122]

The State's position is substantially correct.  First, as to the necessary allegations to support Ohio jurisdiction, Ohio case law confers jurisdiction over a wetland under what is essentially a version of the *Rapanos* plurality test.  Specifically, in *State v. Helms*,[123] the Ohio appeals court recently concluded that wetlands are waters of the state where "the wetlands combine or affect a junction with natural surface or underground waters...."[124]  In addition, *Helms* noted, similarly to the federal decisions discussed earlier, that whether there is a connection between the wetlands and natural surface or underground waters is "a question of fact."[125]

The State has sufficiently pled the existence of jurisdiction in Ohio law by asserting: (1) the existence of a wetland (2) through which flows a perennial stream that is (3) a tributary of the Chagrin River.  As such, the State has alleged a junction between the wetlands, the stream, and the natural surface waters of the Chagrin River, thereby conforming to the jurisdictional test outlined in *Helms*.[126]

---

[122] ECF # 60 at 9-10.

[123] *State ex rel. Cordray v. Helms*, 192 Ohio App. 3d 426, 949 N.E.2d 522 (2011).

[124] *Id*., 192 Ohio App. 3d at 434, 949 N.E.2d at 528.

[125] *Id*.

[126] This conclusion is not altered by Developers' contention that the State has not sufficiently pled as to the existence of a wetland.  ECF # 71 at 3.  As the State observes, it has pled the factual allegation that wetlands on the site exists, as wetlands are defined in the

Similarly, the State has sufficiently pled that the alleged actions by the defendants on the site resulted in significant adverse impacts on the wetland and waters of the State.[127]  As noted, the State has specifically alleged that more than 69.5 acres of wetlands and more than 3,800 linear feet of stream on the site have been dredged and filled, and that such actions have caused suspended solids and other substances to be carried into waters of the State, degraded the remaining wetland, and threaten future degradation.[128]

The State asserts that its allegation about the dredging and filling of a specific amount of wetland acreage and stream capacity is its allegation of what "significant adverse impacts" occurred as a result of the defendants' activities.[129]  Stated differently, the State alleges:  (1) a foundational, basic fact that a specific amount of dredging and filling took place in the wetland; and (2) two related conclusory facts that may be plausibly inferred from the

_____

Ohio Revised Code.  *See*, ECF # 60 at 4 (citing ECF # 2 at ¶ 37).  As before, Developers are incorrect in stating that the State's allegation of the existence of a wetland constitutes a "legal conclusion."  ECF # 71 at 3.  The existence of a wetland under the statute is actually a fact issue.  *See*, *Helms*, 192 Ohio App. 3d at 434-35, 949 N.E.2d at 528-29.  Thus, as discussed above, pleading the conclusory fact of the existence of a wetland in Ohio law requires pleading the basic, foundational fact that the site conforms to the statutory definition of a wetland from which the court may plausibly infer the conclusory fact that a site in that condition is a wetland.  Because that was done here, I recommend concluding that the State has adequately pled the existence of a wetland.

[127] As discussed above, there is no requirement under the federal CWA that any unauthorized discharge had a "deleterious effect" on navigable waters.  *Hubenka*, 438 F.3d at 1035.  The "significance" portion of the "significant nexus" test under the concurring opinion of *Rapanos* goes to establishing that the connection between wetlands and navigable waters is not a "mere trickle."

[128] *See*, ECF # 60 at 6-8 (citing the State's complaint).

[129] *Id.* at 7.

-27-

previous allegation:  (a) that such actions were significant, and (b) that they had an adverse impact on the wetlands and the surface waters.

Thus, under the plausibility pleading standards of *Polyurethane Foam* articulated above, the State's complaint sufficiently states a claim for relief under Ohio law to survive a motion to dismiss under Rule 12(b)(6).  Accordingly, I recommend that Developers' motion to dismiss the State's cross-claim be denied.

## Conclusion

For the foregoing reasons, I recommend that Developers' motions to dismiss the federal and state law claims under Rule 12(b)(6) be denied.

Dated:  December 15, 2011                     s/ William H. Baughman, Jr.
                                              United States Magistrate Judge

## Objections

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the District Court's order.[130]

---

[130] *See*, *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also*, *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

-28-